Melissa A. Fortunato (SBN 319767)
Email: fortunato@bespc.com
BRAGAR EAGEL & SQUIRE, P.C.
445 S. Figueroa Street, Suite 3100
Los Angeles, CA 90071
Telephone: (213) 612-7735
Facsimile: (212) 214-0506

*Attorney for Plaintiff*

[Additional Counsel on Signature Page]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK SPEER, Derivatively and On Behalf of SNAP INC., <br><br> Plaintiff, <br><br> v. <br><br> EVAN SPIEGEL, ROBERT MURPHY, DEREK ANDERSEN, JEREMI GORMAN, REBECCA MORROW, MICHAEL LYNTON, KELLY COFFEY, JOANNA COLES, LIZ JENKINS, STANLEY MERESMAN, SCOTT D. MILLER, POPPY THORPE, and ALAN GEORGE "A.G." LAFLEY, <br><br> Defendants, <br><br> and <br><br> SNAP INC., <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> <u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Mark Speer ("Plaintiff"), derivatively on behalf of nominal defendant Snap Inc. ("Snap" or the "Company"), submits this Verified Shareholder Derivative Complaint against certain current and former officers and directors of the Company (collectively defined herein as the "Individual Defendants"), and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings submitted by the Company to the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by the Company; (iii) securities class action lawsuits filed in this Court captioned *Black v. Snap Inc., et al.*, Case No. 2:21-cv-08892 and *Buscaglia, et al. v. Snap Inc., et al.*, Case No. 2:22-cv-00175 (together, the "Securities Class Actions") alleging violations of the anti-fraud provisions of the federal securities laws based on the alleged issuance of false and misleading statements of material fact, and the alleged omission to state material facts necessary to make other statements made not misleading, from July 22, 2020 to October 21, 2021, inclusive (the "Relevant Period"); and (iv) other publicly available information, including court filings and media and analyst reports, concerning the Company.

## NATURE OF THE ACTION

1.     This derivative action arises from the breaches of the Individual Defendants' fiduciary duties of loyalty, candor and good faith, and abuse of their control of the Company, and other violations of law, in connection with their causing, approving, and/or acquiescing in the Company's issuance of false and misleading statements, as well as failing to disclose material adverse facts about the Company's business, operations, and prospects.

2.      Snap, formerly known as Snapchat, Inc. ("Snapchat"), purports to be a camera company, which offers the social media application Snapchat, an eyewear product that connects with Snapchat and captures video Spectacles, and advertising products including augmented reality ("AR") and Snap ads.  Snap relies on user data for its advertising business.

3.      In June 2020, as part of an ongoing privacy push, Apple Inc. ("Apple")— which developed and maintains the popular mobile operating system, iOS, for its mobile device, the iPhone—publicly announced new data privacy features for iOS. In April 2021, Apple released the new data privacy features for iOS.

4.      Following Apple's June 2020 announcement, the Individual Defendants continuously downplayed and misled investors regarding the impact that Apple's new data privacy features would have on the Company's business.

5.      On October 22, 2021, the Company issued its report for the third quarter of 2021. Therein, Snap announced weaker-than-expected revenue and guidance attributable to its advertising business, which were impacted by Apple's privacy changes. Snap further disclosed that the risks of heighted restrictions on the Company's access and use of user data due to Apple's privacy update had materialized, stating that "in April 2021 Apple issued an iOS update that imposes heightened restrictions on our access and use of user data" and "*[t]hese changes have adversely affected our targeting, measurement, and optimization capabilities, and in turn affected our ability to measure the effectiveness of advertisements on our services. This has resulted in, and in the future is likely to continue to result in, reduced demand and pricing for our advertising products and could seriously harm our business.*" (Emphasis added).

6.      On this news, Snap's stock price fell $19.97 per share, or 26%, to close at $55.14 per share on October 22, 2021, damaging investors and the Company.

7.     Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that: (1) Apple's privacy changes would have, and were having, a material impact on the Company's advertising business; (2) Snap overstated its ability to transition its advertising with Apple's privacy changes; (3) Snap knew of, but downplayed, the risks of the impact that Apple's privacy changes had on the Company's advertising business; (4) Snap overstated its commitment to privacy; and (5) as a result of the foregoing, the Individual Defendants' public statements and statements to journalists were materially false and/or misleading at all relevant times.

8.     The Individual Defendants breached their fiduciary duties of loyalty and good faith by willfully engaging in the deceptions alleged herein.

9.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Snap has sustained damages as described below.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 on two grounds. First, such jurisdiction exists because Plaintiff's state law claims are dependent on the resolution of substantial questions of federal law. Specifically, Plaintiff alleges that the Individual Defendants breached their fiduciary duties to Snap and its shareholders by allowing Snap to violate the federal securities laws. Second, the federal contribution claims asserted herein arise under and pursuant to the provisions of Sections 10(b) and 21(D) of the Securities Exchange Act (the "Exchange Act"), 15 U.S.C. § 78(j)(b) and 15 U.S.C. § 78u-4(g). Plaintiff also asserts pendant common law claims under 28 U.S.C. § 1367. This action is not a

collusive action designed to confer jurisdiction on the court of the United States that it would not otherwise have.

11.     This Court has personal jurisdiction over each of the defendants because each defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## **PARTIES**

13.     Plaintiff is a stockholder of Snap and has been a stockholder of the Company continuously since March 2020.

14.     Defendant Snap is a Delaware corporation with its principal executive offices located at 3000 31st Street, Santa Monica, CA 90405. Snap's shares trade on the New York Stock Exchange under the ticker symbol "SNAP."

15.     Defendant Evan Spiegel ("Spiegel") is the Company's co-founder and has served as its Chief Executive Officer ("CEO") and a member of the Company's Board of Directors (the "Board") since May 2012.

16.     Defendant Robert Murphy ("Murphy") is the Company's co-founder and has served as its Chief Technology Officer and a member of the Board since May 2012.

17.     Defendant Derek Andersen ("Andersen") has served as Snap's Chief Financial Officer since May 2019.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

18.     Defendant Jeremi Gorman ("Gorman") has served as Snap's Chief Business Officer since November 2018.

19.     Defendant Rebecca Morrow ("Morrow") has served as Snap's Chief Accounting Officer since September 2019.

20.     Defendant Michael Lynton ("Lynton") has served on the Company's Board since April 2013 and has been Chairman of the Board since September 2016. He is a member of the Board's compensation committee and nominating and corporate governance committee.

21.     Defendant Kelly Coffey ("Coffey") has served on the Company's Board since May 2020.  She is a member of the Board's audit committee.

22.     Defendant Joanna Coles ("Coles") has served on the Board since December 2015. She is a member of the nominating and corporate governance committee.

23.     Defendant Liz Jenkins ("Jenkins") has served on the Company's Board since December 2020.  She is a member of the audit committee.

24.     Defendant Stanley Meresman ("Meresman") has served on the Company's Board since July 2015. He is a member of the audit committee.

25.     Defendant Scott D. Miller ("Miller") has served on the Company's Board since October 2016. He is a member of the Board's compensation committee and audit committee.

26.     Defendant Poppy Thorpe ("Thorpe") has served on the Company's Board since August 2018. She is a member of the Board's compensation committee and audit committee.

27.     Defendant Alan George "A.G." Lafley ("Lafley") was a member of the Company's Board from July 2016 until his resignation on December 31, 2021. He was a member of the Board's compensation committee and nominating and corporate governance committee.

28.     Defendants named in paragraphs 15-27 are collectively referred to herein as the "Individual Defendants" and, together with nominal defendant Snap, the "Defendants".

## DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith, diligence, and the highest obligations of fair dealing in the administration of the affairs of the Company and in the use and preservation of its property and assets.

30.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

31.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Snap were required to, among other things:

a.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.    conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.    ensure that the Company was operated in a diligent and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

32.    Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

33.   In addition, the Company has also adopted a Code of Conduct (the "Code"). The Code states in pertinent part:

> To be kind, we must comply with the law and our policies — and we must go beyond mere compliance and invest in the health of our stakeholders. It's not enough to avoid misconduct, we must act as a responsible corporate citizen in all we do.
>
> *     *     *
>
> If you're a manager or leader, you play a key role in upholding this Code. That role doesn't begin when a problem arises. Rather, it starts each day with small actions that establish safety, empathy, and trust on your teams and among your colleagues. It's about how you respond to bad news and whether you pause when someone raises a concern. It's about celebrating how someone does a job, not just the end result. And when you are the one who makes a mistake, it's about being vulnerable and sharing your learnings with the team. These small daily acts create space for your team to approach you Snaply and without fear when they see issues.
>
> *     *     *
>
> Our investors trust us by using their resources to back our company. We honor that trust by safeguarding our corporate resources and always operating Snap fairly.
>
> *     *     *
>
> Our commitment to Snap is reflected in how we keep business records. Those records come in all shapes and sizes, from receipts to contracts to our user metrics and published financials. Whatever the type of record, we apply the same approach: we are truthful, transparent, and accurate in our documentation. That's the kind of company that investors and the public can trust.
>
> *     *     *

Investors need to trust what we say because they make their investment decisions based on our disclosures. We take that trust seriously and never make misleading public statements, particularly those related to our finances, user metrics, and any other data about the company. Likewise, we are truthful and Snap when communicating with third parties about our business.

*      *      *

Our global corporate citizenship begins by respecting the laws of the places where we operate.

34.     As noted in the Company's Corporate Governance Guidelines:

**ROLE OF THE BOARD OF DIRECTORS**

Our stockholders select directors to provide oversight and strategic guidance to senior management. A director's responsibility is to fulfill his or her fiduciary duties of care and loyalty, and otherwise to exercise his or her business judgment in the best interests of Snap Inc. and our stockholders. Board service requires significant time and attention. More specifically, the Board has responsibilities to review, approve, and monitor fundamental financial and business strategies, assess Snap Inc.'s major risks, and consider ways to address those risks, select and oversee management, and establish and oversee processes to maintain Snap Inc.'s integrity. To fulfill their duties, directors must prepare for meetings and discussions with management, participate in Board meetings, review relevant materials, and serve on committees. We expect directors to maintain an attitude of constructive involvement and oversight, ask relevant and incisive questions, and demand Snap and accurate answers. Directors must act with integrity and we expect them to demonstrate a commitment to Snap Inc., our values, our business, and long-term stockholder value.

35.     Moreover, the Audit Committee's Charter states in pertinent part:

**PURPOSE**

The purpose of the Audit Committee of Snap Inc. is to:

• help the Board of Directors oversee Snap Inc.'s corporate accounting and financial reporting processes, systems of internal control, and financial-statement audits;

• manage the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms engaged as Snap Inc.'s independent outside auditors for the purpose of preparing or issuing an audit report or performing any services;

• review any reports or disclosures required by applicable rules and regulations of the Securities and Exchange Commission (the "SEC") and applicable stock exchange;

• oversee the organization and performance of Snap Inc.'s internal audit function; and

• provide regular reports and information to the Board with respect to material issues.

\*   \*   \*

***Internal Control and Procedures:***

• **Risk Assessment and Management**. The Audit Committee will review and discuss with Snap Inc. management and the independent auditors Snap Inc.'s policies on financial risk management and assessment. The Audit Committee will provide regular reports to the Board about material issues affecting the quality or integrity of Snap Inc.'s financial statements, compliance with legal or regulatory requirements, the performance or independence of the independent auditors, the performance of Snap Inc.'s internal audit function, and other matters as the Audit Committee deems appropriate.

• **Internal Auditors**. The Audit Committee will review the audit plan of Snap Inc.'s Internal Audit team and discuss with that team the adequacy and effectiveness of Snap Inc.'s scope, staffing, and general audit approach. The Audit Committee will review any significant reports prepared by Snap Inc.'s internal auditors, as well as

management's response. The head of the internal auditors will also report to and be evaluated by the Audit Committee.

• **Internal Control over Financial Reporting; Disclosure Controls**. The Audit Committee will confer with Snap Inc. management and the independent auditors concerning the scope, design, adequacy, and effectiveness of internal control over financial reporting and Snap Inc.'s disclosure controls and procedures. The Audit Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies. Periodically, the Audit Committee will meet in separate sessions with the independent auditors, Snap Inc.'s internal auditors, and Snap Inc. management to discuss any matters that any of these parties believe should be discussed privately with the Audit Committee.

• **Correspondence with Regulators**. The Audit Committee will consider and review with Snap Inc. management, the independent auditors, and outside advisors or accountants any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding Snap Inc.'s financial statements or accounting policies.

• **Internal Control Report**. At least annually, the Audit Committee will review a report by the independent auditors describing any material issues raised by (i) that firm's internal quality-control review, (ii) any peer review of the firm's internal quality control review, or (iii) any inquiry or investigation by governmental or professional authorities conducted in the last five years of any audit performed by the independent auditors. As part of this annual review, the independent auditors' report will also describe any steps taken to address the issues raised.

• **Complaint Procedures**. The Audit Committee is responsible for overseeing procedures for receiving, retaining, and investigating: complaints received by Snap Inc. regarding accounting, internal accounting controls, or auditing matters and the confidential; and

confidential and anonymous submissions by employees concerning questionable accounting or auditing matters.

• **Ethical Compliance**. The Audit Committee will review the results of management's efforts to monitor compliance with Snap Inc.'s programs and policies adhering to applicable laws and rules, including Snap Inc.'s Code of Conduct.

• **Related Party Transactions**. The Audit Committee will review and approve, in accordance with Snap Inc.'s policies, any related party transaction as defined by applicable rules and regulations.

• **Cybersecurity and Privacy**. The Audit Committee will annually review with Snap Inc. management Snap Inc.'s cybersecurity and data privacy rules.

## **SUBSTANTIVE ALLEGATIONS**

**COMPANY BACKGROUND**

36.    Snap was founded on September 16, 2011, by Defendant Spiegel, Defendant Murphy, and Reggie Brown. The Company developed and maintains technological products and services, namely Snapchat, Spectacles, and Bitmoji. The Company was named Snapchat Inc. at its inception, but it was rebranded Snap on September 24, 2016, to include the Spectacles product under the Company name.

37.    Snap offers a few product lines: (1) the social media application Snapchat; (2) an eyewear product that connects with Snapchat and captures video Spectacles; and (2) advertising products including AR and Snap ads. The vast majority of Snap's revenue derives from selling digital advertising on its app.

38.    In June 2020, as part of an ongoing privacy push, Apple—which developed and maintains the popular mobile operating system, iOS, for its mobile devices, the iPhone, publicly announced new data privacy features for iOS. In April 2021, Apple released the new data privacy features for iOS.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

39.     Snap relies on user data for its advertising business. Following Apple's June 2020 announcement, Snap continuously downplayed and misled investors regarding the impact of Apple's new data privacy features would have on its business.

**THE INDIVIDUAL DEFENDANTS CAUSED THE COMPANY TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD**

40.     The Relevant Period begins on July 22, 2020. On that day, Snap filed with the SEC a quarterly report on Form 10-Q for the period ended June 30, 2020 (the "2Q20 Report") which was signed by defendants Andersen and Morrow. Attached to the 2Q20 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by defendants Andersen and Spiegel attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

41.     The 2Q20 Report stated the following, in pertinent part, regarding Snap's advertising business:

> We generate substantially all of our revenues by offering various advertising products on Snapchat, which include Snap Ads and Sponsored Creative Tools, and measurement services, referred to as advertising revenue.
>
> *          *          *
>
> We sell advertising directly to advertisers ("Snap-sold" revenue) and certain partners that provide content on Snapchat ("media partners") also sell directly to advertisers ("partner-sold" revenue). . . .
>
> *          *          *
>
> ***We monetize our business primarily through advertising***. Our advertising products include Snap Ads and Sponsored Creative Tools. We measure our business using ARPU [average revenue per user] because it helps us understand the rate at which we're monetizing our daily user base.

(Emphasis added.)

42.     The 2Q20 Report merely stated the following regarding Apple's publicly known privacy change:

> Furthermore, changes to iOS or Android operating systems' practices and policies, such as Apple's upcoming iOS update that *may impose heightened restrictions on our access and use of user data, may reduce the quantity and quality of the data and metrics that can be collected or used by us and our partners*, and adversely affect our ability to effectively target advertisements to users and demonstrate the value of our advertisements to advertisers, any of which could reduce the demand and pricing for our advertising products and seriously harm our business. *The impact of these proposed changes on the overall mobile advertising ecosystem, our business, and the developers, partners, and advertisers within our community is uncertain* depending on how these changes are implemented, how we and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond, could seriously harm our business. Any adverse effects could be particularly material to us because we are still early in building our advertising business. Our advertising revenue could be seriously harmed by many other factors, including: … changes in our analytics and measurement solutions, including what we are permitted to collect and under the terms of Apple's and Google's mobile operating system, that demonstrate the value of our advertisements and other commercial content; … our inability to collect and disclose data or access a user's Identifier for Advertising or similar deterministic identifier that new and existing advertisers may find useful[.]

(Emphasis added.)

43.     On February 4, 2021, during the fourth quarter 2020 earnings call, Defendant Gorman stated the following, in pertinent part, regarding the upcoming Apple update and the Company's purported privacy commitment:

> I'll take the IDFA [Apple's Identifier for Advertisers] one first and the 4x growth as you're saying in our down funnel metrics, we're also thrilled to see that. But as it comes to IDFA and the changes, whether or not they will impact us. The reality is we admire Apple, and we believe that they are trying to do the right thing for their customers. *Their focus on protecting privacy is aligned with our values and the way that we've*

***built our business from the very beginning. So the change here that we're really focused on has less to do with IDFA for which Apple has long offered an opt-out.*** And instead on a much more broad policy change that requires Snapchatters to opt into tracking with other personal identifiers such as their e-mail address, which would make it harder for us and the overall digital ad ecosystem to match advertising outcomes. ***But we've been working really closely with Apple to implement SKAdNetwork, which is their privacy protective solution as well as building our own solutions that use aggregated data to protect privacy. We've been communicating very well with advertisers, we're educating them, talking about them deeply about these coming changes and encouraging them to implement our Conversion API and Measurement Kit to mitigate any of this.*** And then longer term, we're investing in using first-party data from our platform and providing more opportunities for on platform conversion, which will really help. ***Overall, we feel really well prepared for these changes***. But changes to this ecosystem are usually disruptive and the outcome is uncertain.

(Emphasis added.)

44.     On February 5, 2021, Snap filed with the SEC its yearly report on Form 10-K for the period ended December 31, 2020 (the "2020 Annual Report") which was signed by Defendants Spiegel, Murphy, Andersen, Coffey, Coles, Jenkins, Lafley, Lynton, Meresman, Miller, and Thorpe. Attached to the 2020 Annual Report were certifications pursuant to SOX signed by Defendants Andersen and Spiegel attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

45.     The 2020 Annual Report stated the following, in pertinent part, regarding Snap's advertising business:

**Our Advertising Products**

We connect both brand and direct response advertisers to Snapchatters globally. Our ad products are built on the same foundation that makes our consumer products successful. This means that we can take the

things we learn while creating our consumer products and apply them to building innovative and engaging advertising products familiar to our community.

*AR Ads*: Advertising through Snap's AR tools unlocks the ability to reach a unique audience in a highly differentiated way. Ads can be served as Sponsored Lenses or Sponsored Filters. Lenses are designed through our camera to take advantage of the reach and scale of our augmented reality platform to create visually engaging 3D experiences. Filters are entertaining, artistic overlays that appear after you take a Snap. These Lenses and Filters can be memorialized on Snapchat, through Brand Profiles that aggregate content, filters, and lenses in a single, easy to find place.

*Snap Ads*: We let advertisers tell their stories the same way our users do, using full screen videos with sound. These also allow advertisers to integrate additional experiences and actions directly within these advertisements, including watching a long-form video, visiting a website, or installing an app. Snap Ads include the following:

- Single Image or Video Ads: These are full screen ads that are skippable, and can contain an attachment to enable Snapchatters to swipe up and take action.

- Story Ads: Story Ads are branded tiles that live within the Discover section of the Stories tab that can be either video ads or a series of 3 to 20 images.

- Collection Ads: Collection Ads feature four tappable tiles to showcase multiple products, giving Snapchatters a frictionless way to browse and buy.

- Dynamic Ads: Dynamic ads leverage our machine learning algorithm to match a product catalog to serve the right ad to the right Snapchatter at the right time.

- Commercials: Commercials are non-skippable for six seconds, but can last up to three minutes. These ads appear within Snapchat's curated content.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*Campaign Management and Delivery*: **We aim to continually improve the way ads are purchased and delivered. We have invested heavily to build our self-serve advertising platform, which provides automated, sophisticated, and scalable ad buying and campaign management.**

We offer the ability to bid for advertisements that are designated to drive Snapchatters to: visit a website, visit a local business, call or text a business, download an app, or return to an app. ***Additionally, our delivery framework continues to optimize relevance of ads across the entire platform by determining the best ad to show to any given user based on their real-time and historical attributes and activity. This decreases the number of wasted impressions while improving the effectiveness of the ads that are shown to our community. This helps advertisers increase their return on investment by providing more refined targeting, the ability to test and learn with different creatives or campaign attributes in real time, and the dynamics of our self-serve pricing.***

*Measuring Advertising Effectiveness*: **We offer third-party and first-party solutions to provide a vast array of analytics on campaign attributes like reach, frequency, demographics, and viewability; changes in perceptions like brand favorability or purchase intent; and lifts in actual behavior like purchases, foot traffic, app installs, and online purchases.**

\*     \*         \*

**We monetize our business primarily through advertising**. Our products include Snap Ads and AR Ads. We measure our business using ARPU because it helps us understand the rate at which we are monetizing our daily user base.

\*     \*         \*

*Revenue*

**We generate substantially all of our revenue through the sale of our advertising products**, which primarily include Snap Ads and AR Ads, and measurement services, referred to as advertising revenue. Snap Ads may be subject to revenue sharing arrangements between us and the

media partner. We also generate revenue from sales of our hardware product, Spectacles. This revenue is reported net of allowances for returns.

*        *            *

**We generate substantially all of our revenues by offering various advertising products on Snapchat**, which include Snap Ads and AR Ads, referred to as advertising revenue. AR Ads include Sponsored Filters and Sponsored Lenses. Sponsored Filters allow users to interact with an advertiser's brand by enabling stylized brand artwork to be overlaid on a Snap. Sponsored Lenses allow users to interact with an advertiser's brand by enabling branded augmented reality experiences.

(Emphasis added).

46.    The 2020 Annual Report stated the following, in pertinent part, regarding the Company's purported commitment to privacy:

**Our Commitment to Privacy**

**Our approach to privacy is simple: Be upfront, offer choices, and never forget that our community comes first.**

We built Snapchat as an antidote to the context-less communication that has plagued "social media." **Not so long ago, a conversation among friends would be just that: a private communication in which you knew exactly who you were talking to, what you were talking about, and whether what you were saying was being memorialized for eternity. . . .**

**When you read our Privacy Policy, we hope that you'll notice how much we care about the integrity of personal communication.** For starters, we've written our Privacy Policy in plain language because we think it's important that everyone understand exactly how we handle their information. Otherwise, it's hard to make informed choices about how you communicate. We've also created a robust Privacy Center where we show that context and choice are more than talking points. **There, we point out the many ways that users can control who sees their Snaps and Stories, and explain how long content will remain on**

***our servers, how users can manage the information that we do have about them, and much more***. This is where you'll also find our Transparency Report.

We also understand that privacy policies—no matter how ambitious—are only as good as the people and practices behind those policies. ***When someone trusts us to transmit or store their information, we know we have a responsibility to protect that information and we work hard to keep it secure. New features go through an intense privacy-review process—we debate pros and cons, and we work hard to build products we're proud of and that we'll want to use***. We use Snapchat constantly, both at work and in our personal lives, and we handle user information with the same care that we want for our family, our friends, and ourselves.

(Emphasis added.)

47.     Once again, the 2020 Annual Report merely stated the following regarding Apple's publicly known privacy change:

Furthermore, changes to iOS or Android operating systems' practices and policies, ***such as Apple's upcoming iOS update that may impose heightened restrictions on our access and use of user data, may reduce the quantity or quality of the data and metrics that can be collected or used by us and our partners***, or adversely affect our ability to effectively target advertisements to users or demonstrate the value of our advertisements to advertisers, any of which could reduce the demand and pricing for our advertising products and seriously harm our business. The impact of these proposed changes on the overall mobile advertising ecosystem, our business, and the developers, partners, and advertisers within our community is uncertain. Depending on how these changes are implemented, how we and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond, our business could be seriously harmed. Any adverse effects could be particularly material to us because we are still early in building our advertising business. Our advertising revenue could also be seriously harmed by many other factors, including: . . . changes in our analytics and measurement solutions, including what we are permitted to collect and disclose under the terms of Apple's and Google's mobile operating systems, that demonstrate the value of our advertisements and other

commercial content . . . our inability to measure the effectiveness of our advertising or target the appropriate audience for advertisements[.]

(Emphasis added.)

48.    On July 22, 2021, during the second quarter 2021 earnings call, Defendant Gorman stated, in pertinent part, the following regarding Apple's privacy update and the Company's position:

> Our ad platform is being utilized as an effective self-service tool to help advertisers of all types and sizes create, manage, and measure campaigns on Snapchat. ***Further, it is a reflection of our focus on privacy and innovation as we are delivering results for advertisers while also respecting the privacy of our community, which has been a core tenet since we launched ads on Snapchat.*** This year has clearly demonstrated how important it is to simultaneously meet these two objectives for our advertising partners. ***As Apple rolled-out its App Tracking Transparency-related changes near the end of Q2, we observed higher opt-in rates than we are seeing reported generally across the industry, which we believe is due in part to the trust our community has in our products and our business.*** Apple's rollout of the most recent iOS update came later in Q2 than initially anticipated, and the pace of updates by iPhone users has also been slower than we anticipated. ***This has given us more time with advertisers to navigate the transition*** but also means the effects of these changes will come later than we initially expected.
>
> We continue to work with our advertising partners on privacy-safe solutions and other attribution techniques. ***For example, we fully rolled out support of SKAdnetwork version 3.0, which we believe will aid in improving attribution for advertisers who have implemented Apple's API.*** We also launched Advanced Conversions in Ads Manager, which allows advertisers to measure their campaigns via our privacy-protecting measurement stack. ***We are dedicated to delivering value for our advertising partners while respecting the privacy of our community, as we have worked to do for many years.*** That said, it remains very early in the adoption of the iOS platform changes, and we will continue to learn how these changes may impact our advertising partners, business, and the industry as a whole. We are seeing some initial signals as advertisers test and learn in this new environment and this is causing some interruptions to demand that we had anticipated would be part of

the adoption process, particularly in the direct response e-commerce and gaming sectors. It is too early to determine how long it will take until these changes are fully adopted, the scale of the potential interruptions to demand, or the ultimate impact on the longer term growth of our business. . ..

**We continue to invest heavily in video advertising**, with the goal of driving results for our advertising partners and connecting them to the Snapchat Generation. **For example, we worked with Nielsen to help US advertisers understand how to more efficiently reach their target audiences via Snap Ads.** The Total Ad Ratings (TAR) study analyzed how over thirty cross-platform advertising campaigns reached people on both Snapchat and television. The analysis showed that Snapchat campaigns contributed an average of 16 percent incremental reach to advertisers' target audiences, and over 70 percent of the Gen Z audience that was reached by Snapchat was not reached by TV-only campaigns. This is especially important as people are increasingly cutting the cord, and mobile content consumption continues to grow, **presenting us with a large opportunity to help advertisers reach the Snapchat Generation at scale**.

\*       \*               \*

I think the important thing about IDFA is to really understand that the solutions are not yet fully finalized. Everyone is still evolving, Apple, the entire industry is still evolving. **And we've said this before, and I just want to reiterate that we genuinely support Apple's approach. We've always believed that advertising should respect customer's privacy at its core at Snap and the products that this amazing team has built for the last almost 10 years now.** And we've been working really hard to make this transition smooth for our advertising partners as well as our businesses. **So where we are in the cycle right now is that we rolled out full support of SKAdnetwork version 3.0, which we know will aid or we believe will aid in attribution for advertisers.** And we've also implemented Apple's API. **In addition, we launched Advanced Conversions in Ads Manager so advertisers can measure their campaigns with our privacy conscious measurement stack. And then, you know, I think one of the things that we're observing here is that our opt in rates have been above what is sort of widely reported in both the press as well as with the analyst community. So that's, that's good**,

but it remains so early in these iOS changes and there's no question that it will be a change for the industry in and of itself. ***But you know, I think we prepared it the best that we can. The product teams and the engineering teams have been working really closely with all of our partners and our sales teams to make sure that this transition for our advertisers is as smooth as possible.***

(Emphasis added).

49.    The above statements identified in ¶¶ 40-48 were materially false and/or misleading and/or failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that: (1) Apple's privacy changes would have, and were having, a material impact on the Company's advertising business; (2) Snap overstated its ability to transition its advertising with Apple's privacy changes; (3) Snap knew of, but downplayed, the risks of the impact that Apple's privacy changes had on the Company's advertising business; (4) Snap overstated its commitment to privacy; and (5) as a result of the foregoing, the Individual Defendants' public statements and statements to journalists were materially false and/or misleading at all relevant times.

**THE TRUTH EMERGES**

50.    On October 22, 2021, Snap filed its third quarter 2021 report for the period ending September 30, 2021 with the SEC on Form 10-Q (the "3Q21 Report"), disclosing the Company's weaker-than-expected revenue and weaker-than-expected guidance. This weakness was a result of the Company's advertising business, which included weakness attributable to Apple's privacy changes.

51.    The 3Q21 Report disclosed that the risks of heightened restrictions on the Company's access and use of user data due to Apple's privacy update had materialized, stating in pertinent part:

Furthermore, ***in April 2021 Apple issued an iOS update that imposes heightened restrictions on our access and use of user data***. Google has

announced that it will implement similar changes with respect to its Android operating system and major web browsers, like Safari and Chrome, may make similar changes as well. ***These changes have adversely affected our targeting, measurement, and optimization capabilities, and in turn affected our ability to measure the effectiveness of advertisements on our services. This has resulted in, and in the future is likely to continue to result in, reduced demand and pricing for our advertising products and could seriously harm our business.*** The impact of these changes on the overall mobile advertising ecosystem, our competitors, our business, and the developers, partners, and advertisers within our community is uncertain, and depending on how we, our competitors, and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond, our business could be seriously harmed. In addition, if we are unable to mitigate these and future developments, and alternative methods do not become widely adopted by our advertisers, then our targeting, measurement, and optimization capabilities will be materially and adversely affected, which would in turn continue to negatively impact our advertising revenue. Any adverse effects could be particularly material to us because we are still early in building our advertising business. . . .

(Emphasis added.)

52.     On this news, Snap's stock price fell $19.97 per share, or 26%, to close at $55.14 per share on October 22, 2021, damaging investors and the Company.

## DAMAGES TO SNAP

53.     As a result of the Individual Defendants' wrongful conduct, Snap disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made. The improper statements have devastated Snap's credibility. Snap has been, and will continue to be, severely damaged by the Individual Defendants' misconduct.

54.     Indeed, the Individual Defendants' false and misleading statements as alleged above have subjected Snap to the Securities Class Actions.

55.   As a direct and proximate result of the Individual Defendants' actions as alleged above, Snap's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

56.   Moreover, these actions have irreparably damaged Snap's corporate image and goodwill. For at least the foreseeable future, Snap will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Snap's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## PLAINTIFF'S DEMAND AND DERIVATIVE ALLEGATIONS

57.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

58.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

59.   Plaintiff is an owner of Snap common stock and was an owner of Snap common stock at all times relevant hereto.

60.   Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

61.   As a result of the facts set forth herein, Plaintiff has not made any demand on the Snap Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

62.   At the time this action was commenced, the Board consisted of ten directors: Defendants Spiegel, Murphy, Coffey, Coles, Jenkins, Lynton, Meresman, Miller, and Thorpe (collectively, the "Director Defendants"), and non-defendant director Fidel Vargas. The Director Defendants are incapable of making an

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

independent and disinterested decision to institute and vigorously prosecute this action.

**DEMAND IS FUTILE AS TO THE DIRECTOR DEFENDANTS BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

63. The Director Defendants all face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

64. Moreover, the Director Defendants, as directors, owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and consciously reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

65. The Director Defendants' conscious and knowing making or authorizing of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability. If

the Director Defendants were to bring a suit on behalf of Snap to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile as to the Director Defendants.

**DEFENDANT SPIEGEL LACKS INDEPENDENCE**

66. Defendant Spiegel is not disinterested for purposes of demand futility because his principal occupation is CEO of Snap. Accordingly, his livelihood is dependent on and completely intertwined with the other Director Defendants. In 2020, Defendant Spiegel received $2,094,432 in total compensation. This amount is material to him.

**DEFENDANTS SPIEGEL AND MURPHY**
**LACK INDEPENDENCE AND CONTROL THE BOARD**

67. As noted in the 2020 Annual Report:

Our two co-founders, Evan Spiegel and Robert Murphy, own or control voting shares of our capital stock that represent approximately 99% of the voting power of our outstanding capital stock as of December 31, 2020, and Mr. Spiegel alone can exercise voting control over a majority of our voting power. As a result, Mr. Spiegel and Mr. Murphy, or in many instances Mr. Spiegel acting alone, have the ability to control the outcome of all matters submitted to our stockholders for approval, including the election, removal, and replacement of our directors and any merger, consolidation, or sale of all or substantially all of our assets.

If Mr. Spiegel's or Mr. Murphy's employment with us is terminated, they will continue to have the ability to exercise the same significant voting power and potentially control the outcome of all matters submitted to our stockholders for approval. Either of our co-founders' shares of Class C common stock will automatically convert into Class B common stock, on a one-to-one basis, nine months following his death or on the date on which the number of outstanding shares of Class C common stock held by such holder represents less than 30% of the Class C common stock held by such holder on the closing of our IPO,

or 32,383,178 shares of Class C common stock. Should either of our co-founders' Class C common stock be converted to Class B common stock, the remaining co-founder will be able to exercise voting control over our outstanding capital stock. Moreover, Mr. Spiegel and Mr. Murphy have entered into a proxy agreement under which each has granted to the other a voting proxy with respect to all shares of our Class B common stock and Class C common stock that each may beneficially own from time to time or have voting control over. The proxy would become effective on either founder's death or disability. Accordingly, on the death or incapacity of either Mr. Spiegel or Mr. Murphy, the other could individually control nearly all of the voting power of our outstanding capital stock.

68.     Given this, Defendants Spiegel and Murphy dominate and control the Board. The other members of the Board serve at the pleasure of Defendants Spiegel and Murphy since they are able to replace or remove directors at their choosing. Thus, the rest of the members of the Board are beholden to Defendants Spiegel and Murphy and would not want to do anything to jeopardize their positions at the Company. This is especially true given how much each of the directors are compensated for their services. In 2020, Defendants Coffey, Coles, Jenkins, Lynton, Meresman, Miller, and Thorpe were paid $346,394, $342,341, $165,152, $437,341, $367,341, $342,341, and $342,341, respectively.   These amounts are material to each of them.

69.     Moreover, the 2020 Annual Report specifically recognizes that Defendants Spiegel and Murphy are not independent:

Our board of directors has undertaken a review of the independence of each director. Based on information provided by each director concerning his or her background, employment, and affiliations, our board of directors has determined that Ms. Coffey, Ms. Coles, Ms. Jenkins, Mr. Lafley, Mr. Lynton, Mr. Meresman, Mr. Miller, and Ms. Thorpe do not have relationships that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director and that each of these directors is "independent" as that term is

defined under the listing standards. In making these determinations, our board of directors considered the current and prior relationships that each non-employee director has with our company and all other facts and circumstances our board of directors deemed relevant in determining their independence, including the beneficial ownership of our shares by each non-employee director and the transactions described above.

## DEFENDANT SPIEGEL FACES A SUBSTANTIAL LIKELIHOOD OF LIABILITY

70.     Defendant Spiegel is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Actions.

## DEMAND IS EXCUSED AS TO DEFENDANTS COFFEY, JENKINS, MERESMAN, MILLER, AND THORPE BECAUSE AS MEMBERS OF THE AUDIT COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY

71.     Defendants Coffey, Jenkins, Meresman, Miller, and Thorpe, as members of the audit committee during the Relevant Period, participated in and knowingly approved the filing of false and misleading financial statements. More specifically, as members of the audit committee, Defendants Coffey, Jenkins, Meresman, Miller, and Thorpe were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, Defendants Coffey, Jenkins, Meresman, Miller, and Thorpe, as members of the audit committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter. For this reason, demand is futile as to Defendants Coffey, Jenkins, Meresman, Miller, and Thorpe.

## COUNT I

### Breach of Fiduciary duty Against the Individual Defendants

72.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

73.  Each of the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Snap's business and affairs.

74.  Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

75.  The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Snap.

76.  In breach of their fiduciary duties owed to Snap, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Apple's privacy changes would have, and were having, a material impact on the Company's advertising business; (2) Snap overstated its ability to transition its advertising with Apple's privacy changes; (3) Snap knew of, but downplayed, the risks of the impact that Apple's privacy changes had on the Company's advertising business; (4) Snap overstated its commitment to privacy; and (5) as a result of the foregoing, the Individual Defendants' public statements and statements to journalists were materially false and/or misleading at all relevant times.

77.  Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls, as demonstrated by the fact

that the Individual Defendants knew that the Company did not have any internal audit function.

78.    The Individual Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

79.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Snap has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

80.    Plaintiff, on behalf of Snap, has no adequate remedy at law.

## COUNT II

### FOR FEDERAL CONTRIBUTION AGAINST DEFENDANTS SPIEGEL, ANDERSEN, GORMAN, AND MORROW

81.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

82.    Defendants Spiegel, Andersen, Gorman, and Morrow have been named as defendants in the Securities Class Actions.

83.    Defendants Spiegel, Andersen, Gorman, and Morrow had a duty not to defraud the investing public with the dissemination of materially false and misleading press releases and the dissemination of materially false and misleading financial statements during the Relevant Period.

84.    Although Plaintiff does not adopt the allegations of wrongdoing that are alleged in the Securities Class Actions as his own, if the Company is deemed to have violated the federal securities laws, and incurs damages therefore, such damages should not be disproportionately borne by the Company, and Defendants Spiegel, Andersen, Gorman, and Morrow are liable to the Company for contribution pursuant to sections 10(b) and 21(D) of the Exchange Act.

85.     Accordingly, Plaintiff asserts this claim derivatively for contribution as provided by statute.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all of the Individual Defendants as follows:

A.     Declaring that Plaintiff may maintain this action on behalf of Snap, and that Plaintiff is an adequate representative of the Company;

B.     Declaring that the Individual Defendants have breached their fiduciary duties to Snap and committed violations of the federal securities laws;

C.     Directing Snap to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By- Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Dated: February 28, 2022

Respectfully submitted,

**BRAGAR EAGEL & SQUIRE, P.C.**

*/s/ Melissa A. Fortunato*
Melissa A. Fortunato (SBN 319767)
445 S. Figueroa Street, Suite 3100
Los Angeles, CA 90071
Telephone: (213) 612-7735
Facsimile: (212) 214-0506
Email: fortunato@bespc.com

*Attorney for Plaintiff*

**OF COUNSEL:**

Michael Hynes
Ligaya Hernandez
Hynes & Hernandez, LLC
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-3116
Facsimile: (484) 875-9273

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**VERIFICATION**

I, Mark Speer  hereby  verify  that  I  have  authorized  the  filing  of  the  attached Verified  Shareholder  Derivative  Complaint,  that  I  have  reviewed  the  Verified  Shareholder Derivative  Complaint  and  that  the  facts  therein  are  true  and  correct  to  the  best  of  my  knowledge, information  and  belief.  I  declare  under  penalty  of  perjury  that  the  foregoing  is  true  and  correct.

Dated: February ___, 2022

_____
Mark Speer (Feb 19, 2022 12:07 EST)

Mark Speer